UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PHILADELPHIA INDEMNITY INSURANCE COMPANY, | ) ) ) | |
| Plaintiff/Counterclaim Defendant, | ) ) | |
| vs. | ) ) | Case No. 1:13-cv-1453-SEB-DML |
| WE PEBBLE POINT, | ) ) | |
| Defendant/Counterclaimant. | ) | |

## Report and Recommendation on Defendant's Motion to Set Aside Appraisal Award

Before the court for a report and recommendation on its appropriate disposition is a motion filed by defendant/counterclaimant WE Pebble Point ("Pebble Point"), the insured, to set aside an appraisal award. (Dkt. 39).  Pebble Point contends the appraisal process leading to the award was tainted and the award should not stand or bind it.  The plaintiff, Philadelphia Indemnity Insurance Company ("Philadelphia Insurance"), opposes the motion.  As addressed below, the Magistrate Judge recommends that the District Judge GRANT the motion, set aside the appraisal award, and order that the parties' insurance dispute may now be adjudicated in this court.

## Introduction

The court first will summarize events that led to the initiation of this litigation and to the District Judge's order requiring the parties to proceed with an

appraisal procedure described in the subject insurance policy. Next, the court will recite the appraisal language of the policy and describe the process by which the court selected an umpire to act in the appraisal procedure. The court will then describe the events occurring within the appraisal process leading to an appraisal award, at least as those events are illuminated by documents and affidavits filed with the court. Finally, the court will analyze the issues raised by Pebble Point's motion to set aside in light of the governing law and the facts and inferences gleaned from the evidence submitted by the parties.

The court held a hearing on October 1, 2015, on Pebble Point's motion to set aside the appraisal award. The parties stated they had no materials or evidence to offer other than the documents they had submitted to the court at various times. The court will consider these documents, the authenticity of which was not disputed by the parties. They consist of:

- The appraisal award in the amount of $29,743.27, dated June 8, 2015, by umpire David J. Balistreri, and dated June 9, 2015, by appraiser Steve Zwolfer (the appraiser selected by Philadelphia Insurance). Dkt. 40-10.

- Affidavit of Don Lamont, the appraiser selected by Pebble Point. Dkt. 39-1.

- Affidavit (with attached emails) of appraiser Steve Zwolfer. Dkt. 41-5.

- Additional emails between or among Mr. Lamont (Pebble Point's appraiser), Mr. Zwolfer (Philadelphia Insurance's appraiser), and Mr. Balistreri (the umpire). Dkts. 41-3 and 41-4.

- Mr. Zwolfer's December 2014 damages estimate at replacement cost value in the amount of $6,114.75.

- Mr. Lamont's December 2014 damages estimates at actual cost value (without recoverable depreciation) in the amount of $562,040.00 and at

replacement cost value (with recovery for depreciation) in the amount of $641,005.26.

## Relevant Facts

### I.   Procedural History

This case is an insurance coverage dispute.  Pebble Point owns an apartment complex in Indianapolis, Indiana. Philadelphia Insurance issued two materially identical policies to Pebble Point that cover certain losses at the apartment complex for the periods November 22, 2011, to November 22, 2012, and November 22, 2012, to November 22, 2013 (together, the "Policy").  In December 2012, Pebble Point made a claim against the Policy for damages to apartment buildings within the complex—primarily to the roofs of the 22 buildings making up the complex—allegedly caused by an October 2012 storm.  Pebble Point also made a second claim against the Policy because of a different, later storm.  For ease of reference, the court groups the policies, claims, and storms, and will refer to only one Policy, one claim, and one storm.  The issues currently before the court do not require distinction between different storms and claims or the two separate policies, and it is simpler to refer to them collectively.

Philadelphia Insurance investigated the claim and determined that the majority of losses claimed by Pebble Point were not caused by the storm (the Policy covers loss caused by "windstorm or hail" and "water damage") but by non-covered causes such as improper installation or maintenance of roofing shingles, other roofing construction defects, or wear and tear.  Philadelphia Insurance paid Pebble Point an amount equal to the damages it found were caused by a covered event

3

minus Pebble Point's $10,000 deductible, or a total of $6,288.56.  When Pebble Point challenged Philadelphia Insurance's evaluation of the claim, Philadelphia Insurance took another look but reached essentially the same conclusion, *i.e.*, that few of the problems with Pebble Point's roofs were the result of the storm and thus covered losses.

Pebble Point disagreed that the damages were the result of non-covered causes.  It maintained its losses ranged in the hundreds of thousands of dollars, and demanded Philadelphia Insurance to participate in an appraisal proceeding as outlined in the Policy.  Philadelphia Insurance declined to do so on the ground it believed the parties' dispute concerned the extent of *covered* losses rather than the "amount of loss."  Philadelphia then brought this suit seeking a declaratory judgment that it had fully satisfied its obligations under the Policy for the claim made by Pebble Point.

Pebble Point moved to dismiss Philadelphia Insurance's complaint on the ground Pebble Point was entitled to enforce the appraisal provision of the Policy. This court agreed with Pebble Point.  The court ruled:

> [Philadelphia Insurance's] [P]olicy makes clear that the results of an appraisal do not necessarily constitute the last word; appraisers' competence is limited to assessing the amount of loss, and not to interpreting other provisions of the [P]olicy.  Where, as here, the parties dispute the amount of loss and one has demanded appraisal, however, we conclude that it is premature to consider [Philadelphia's] suit for a declaratory judgment enshrining its own estimates of the amount of covered damage.  We accordingly GRANT Defendant's motion to dismiss Plaintiff's complaint for declaratory judgment, which we dismiss WITHOUT PREJUDICE, and we order the parties to proceed to the appraisal process as provided in the [P]olicy.

(Dkt. 29 at p. 14).

## II.   The Appraisal Provision and Selection of an Umpire

Pebble Point's claim sought coverage under the Commercial Property section

of the Policy, which contains this Appraisal Provision at Section E.2:

### 2.   Appraisal

If we and you disagree on the value of the property or the amount
of "loss",[1] either may make written demand for an appraisal of
the "loss".  In this event, each party will select a competent and
impartial appraiser.  The two appraisers will select an umpire.  If
they cannot agree, either may request that selection be made by
a judge of a court having jurisdiction.  The appraisers will state
separately the value of the property and amount of "loss".  If they
fail to agree, they will submit their differences to the umpire.  A
decision agreed to by any two will be binding.  Each party will:

a.       Pay its chosen appraiser; and
b.       Bear the other expenses of the appraisal and umpire
equally.

If there is an appraisal, we will still retain our right to deny the
claim.

(Policy, Dkt. 40-2, at p. 37).

Pebble Point and Philadelphia Insurance each selected its own appraiser—

men each had hired many months before to provide an opinion about the extent of

Pebble Point's loss.  Each party filed a motion asking the court to appoint an

umpire, and each provided the court with curriculum vitae of various persons they

represented to be neutral and competent.  *See* Pebble Point's motion, Dkt. 30, at p. 2;

Philadelphia's motion, Dkt. 31, at p. 2.  The court selected Mr. David J. Balistreri,

---

[1]       "Loss" is defined in the Policy as accidental loss or damage.  Policy, Dkt. 40-2
at p. 46.

who had been proposed by Philadelphia Insurance, to act as the umpire, after finding that its review of the candidates' curriculum vitae indicated all appeared to be competent to work as an umpire, and that an umpire located geographically close to Indiana might save time and money.[2]  (Dkt. 33).

## III.   The Appraisal Process and the Award

### A. Initial Communications and Scheduling a Site Inspection

In mid-March 2015, Mr. Balistreri (the umpire) asked the two appraisers to provide documentation of damages.  (Lamont Aff., Dkt. 39-1, ¶ 2).  Mr. Lamont, Pebble Point's appraiser, provided a copy of the damages estimate he had prepared in December 2014 (*id.*) and Mr. Zwolfer, Philadelphia Insurance's appraiser, provided his December 2014 damages estimate.  (*See* May 19, 2015 Balistreri email recounting his receipt of an adjuster report from Mr. Zwolfer, Dkt. 39-1 at ¶ 5).  In the next few months, the appraisers and Mr. Balistreri communicated about dates available for an inspection at the apartment complex.  (Lamont Aff., ¶¶ 3-4; Zwolfer Aff., ¶ 6)).  Apparently, Mr. Balistreri initially set the inspection for Tuesday, April 2 (Balistreri email to "Gentlemen" recommending inspection for "Tuesday the 2nd," Dkt. 41-3 at p. 3), but later set it for Thursday, May 28, 2015.  (Zwolfer Aff., ¶ 7).  About one month before the inspection date, on April 22, 2015, Mr. Lamont emailed to Mr. Balistreri an engineering report prepared by engineer Eduard Badiu of

---

[2]      Mr. Balistreri's CV listed his business address in Wisconsin. Dkt. 31-1. Philadelphia Insurance had argued that because the candidates proposed by Pebble Point were located in either Texas or Florida, their appointment would "unnecessarily increase costs and expenses associated with completing the appraisal."  Dkt. 31 at p. 2.

CEBB Engineering & Testing on behalf of Pebble Point regarding its claimed losses. (Lamont Aff., ¶ 4).  Mr. Badiu's report is dated April 15, 2015.  (*Id.,* ¶ 7).[3]

The appraisers and umpire did not want to conduct the inspection in wet weather because they intended to inspect roofs.  Emails were exchanged about a date with more favorable weather prospects.  (*See* Dkt. 41-3).  Some of these emails were exchanged between Mr. Zwolfer and Mr. Balistreri only, without including Mr. Lamont.  Those communications are now viewed by Pebble Point, when considered in the context of the entire appraisal process, as indicative of bias by Mr. Balistreri in favor of Philadelphia Insurance.  Mr. Lamont learned of the email communications that had excluded him when they were forwarded with a May 25, 2015 email sent by Mr. Balistreri to both appraisers advising he would decide the following day, based on weather reports, whether to hold the inspection on May 28. (Dkt. 41-3 at p. 2). The appraisers and umpire met for the inspection at Pebble Point apartments on Thursday, May 28.

---

[3]     At some point Mr. Balistreri may have been provided with an engineering report prepared by Rimkus Consulting Group, Inc. on behalf of Philadelphia Insurance when it initially evaluated Pebble Point's claim in 2013.  An email sent by Mr. Lamont referred to a discussion among the appraisers and umpire at the May 28 inspection about "the Rimkus engineer report and their associated photos." Mr. Lamont noted that one issue addressed at the inspection could be evaluated by the umpire's review of that report.  Mr. Balistreri responded that Mr. Lamont's "comments are acknowledged."  *See* Dkt. 41-5 at p. 4.  None of the parties' submissions indicates when or how Mr. Balistreri was given the Rimkus report, if indeed Philadelphia Insurance or Mr. Zwolfer did supply it.

## B. Mr. Balistreri's Rules for Submitting Information and Testimony

In the 10-day period before the inspection, several emails were exchanged regarding the scope of information the umpire would consider. These emails are central to Pebble Point's motion to set aside the appraisal. The first one is dated May 19, 2015, from Mr. Balistreri to Mr. Lamont and Mr. Zwolfer. Mr. Balistreri described the information he had received to date and requested confirmation regarding the scope of information and testimony the parties intended to provide him. It reads, in pertinent part:

> Do I have all reports/documents you will be submitting for review? I believe I have adjuster reports (one from each side) and an engineer report from Don [Lamont]. Also – are there any persons other than yourselves who will provide testimony/opinions regarding this matter? If so please identify them. I do not accept last minute submissions at the site. I hope to be able to settle this the day of our site visit but have allowed some time on Friday [the 29th] if additional paperwork is required.

(Lamont Aff., Dkt. 39-1, ¶ 5).

Mr. Lamont responded that Pebble Point's engineer would attend the site meeting. (*Id.,* ¶ 6). On May 26, 2015, Mr. Balistreri sent an email to both appraisers and asked Mr. Lamont to confirm that the referenced engineer was Mr. Badiu (whose report Mr. Balistreri had already been provided) and whether his testimony would concern his report. Mr. Balistreri also instructed Mr. Lamont to distribute any engineer reports "to the entire appraisal panel," and set a deadline of *that day* for the submission of any documents. This email reads:

> Don [Lamont] –

8

> If you intend to have your engineer testify to anything on the date of our site visit please identify him, what his testimony will regard, and distribute any reports he may have written <u>to the entire appraisal panel</u> before end of day today. Please be certain Steve [Zwolfer] and I have a complete copy to review prior to our site visit.
>
> I assume your engineer is Badiu, has written and will testify regarding his report (dated 4/15/2015), which has 39 pages in total.  This is the report I have which you sent to me earlier.
>
> I will not accept any documents for consideration after today that have not been previously shared with the entire panel.

(Lamont Aff., Dkt. 39-1, ¶ 7; emphasis in original).

Mr. Lamont's office responded that same day with an email to both Mr. Balistreri and Mr. Zwolfer and included a Drop Box link containing Mr. Badiu's engineering report—the same one that had already been given to Mr. Balistreri on April 22.  The Drop Box link also contained some additional photographs the engineer had taken that had not been included as part of the original report sent to Mr. Balistreri—a standard practice (not initially sending all photographs), according to Mr. Lamont.  (*Id.* ¶¶ 8-9).

In response to that email, Mr. Balistreri stated he was "rejecting [the] admission" of the "stuff in the drop box" because it was too much information to download, print, and review.  His email reads:

> The stuff in the drop box is too much to download, print, review and make sense of prior to our site visit.
>
> I asked for all this stuff a long time ago and as there is little time at this late hour I am rejecting its admission.

(*Id.* ¶ 9).  Mr. Balistreri then confirmed at the May 28 site meeting that he would not consider Mr. Badiu's engineering report *and* he would not permit Mr. Badiu to

provide any testimony as to his engineering findings.  He stated, "because of the late submission of the engineering report I am not going to allow it, nor will I allow Mr. Badiu to testify as to his findings."  (*Id.* ¶ 10).  Except for additional photographs, the engineering report referenced by Mr. Balistreri had been given to him more than one month before, on April 22, 2015.  (Lamont Aff., ¶¶ 4, 8-9).

### C. The Site Inspection

Engineer Badiu was not permitted to provide any input at the May 28 site inspection/meeting even though he was at the site that day.  (*See* May 28, 2015 Lamont email, Dkt. 41-3, referencing the rejection of Pebble Point's engineer and forbidding him from providing testimony).

At the site meeting, Mr. Lamont apparently noticed a familiarity between Mr. Balistreri and Mr. Zwolfer.  Mr. Lamont has testified that he asked them "about full disclosure and the working relationship between" them, and "they each shrugged their shoulders and walked away from me."  (*Id.* ¶ 12).  Mr. Zwolfer agrees that Mr. Lamont inquired at the beginning of the meeting about the past working relationship between him and Mr. Balistreri, but he disputes they ignored the question.  Mr. Zwolfer says that he and Mr. Balistreri disclosed at that time that Mr. Balistreri "had served as an engineer on one or two of [Mr. Zwolfer's] prior claims."  (Zwolfer Aff., ¶¶ 13-14).  The court has never been provided any further information about the timing or extent of Mr. Balistreri's and Mr. Zwolfer's prior work together.  Mr. Zwolfer elaborated only that he has worked on many claims over 35 years.  (Zwolfer Aff., ¶ 15).

In addition to the dispute between Mr. Lamont and Mr. Zwolfer concerning the disclosure of a past relationship between Mr. Zwolfer and Mr. Balistreri, they have differing views about the thoroughness of the inspection itself.  They agree that they and Mr. Balistreri did not conduct a physical inspection of every roof (there are 22 buildings) and did not inspect any interior portions of any buildings. (Lamont Aff., ¶ 11, Zwolfer Aff., ¶¶ 11-12).  Mr. Lamont and Pebble Point contend Mr. Balistreri should have inspected each roof because each building has varying degrees of damage and "while some of the buildings may have the same size roof, they face different directions and have different age and different number of roof coverings." (Lamont Aff., ¶ 11).  Mr. Zwolfer states the three of them agreed at the site that every roof would not be inspected and, instead, they would "take a sampling of the damage sustained by some of the roofs." (Zwolfer Aff., ¶ 11).  There is no evidence about how many, or which, of the 22 building roofs were physically inspected.  Mr. Lamont also contends Mr. Balistreri "refused" to look at interior damage caused by leaking roof areas, even though Mr. Balistreri was aware Pebble Point claimed losses to interiors of common areas and individual apartments. (Lamont Aff., ¶ 11).  Mr. Zwolfer counters here that Mr. Lamont never requested Mr. Balistreri to examine interior damage (Zwolfer Aff., ¶ 12), a point Pebble Point did not contest in its reply brief or at the October 1, 2015 hearing.

The next salient event is Mr. Balistreri's umpire decision.

### D. The Umpire Decision and Appraiser Award

On June 8, 2015, Mr. Balistreri sent an email to Messrs. Lamont and Zwolfer attaching his "award document." (Dkt. 41-4.) It is a one-page document titled Appraisal Award, in the amount of $37,179.09 for loss replacement cost or $29,743.27 for loss actual cash value, as to "any and all roof related charges [for roof coverings on 22 buildings] to restore Pebble Point, LLC to pre loss condition," less any applicable deductible or previous payment associated with the claim. (*Id*.) The Policy provides that an appraisal decision "agreed to by any two" is binding. Mr. Zwolfer signed the award, signifying his agreement to Mr. Balistreri's loss figures, on June 9, 2015. (*Id*.)

On June 14, 2015, Mr. Lamont sent an email to Mr. Balistreri (copied to Mr. Zwolfer), asking for an explanation he could provide Pebble Point as to why Mr. Balistreri had decided to not allow Pebble Point's engineer's report or Mr. Badiu to testify about his expert opinion: "So that I may provide an explanation to my client, can you please advise me as to why you chose not to allow my clients engineering report to be submitted as well as why you did not allow my clients expert to testify at the appraisal hearing." (Dkt. 41-4 at p. 1.) Mr. Balistreri responded:

> I set the award based on the testimony of both appraisers, all reports submitted, and my visual examination of the site.
>
> You did not provide ample notification for the other side to have their own expert present even though I asked for notification ten days prior to our inspection. I did, however, consider his report.

(*Id*.).

With this background, the court now turns to an exposition of the law governing a request to set aside an appraisal award and its analysis of Pebble Point's motion.

## Analysis

## I.   Standard for Setting Aside an Appraisal Award

The parties agree that Indiana law governs and that the court should apply the standards announced by the Indiana Court of Appeals in *Atlas Construction Co. v. Indiana Insurance Co.,* 309 N.E.2d 810 (Ind. Ct. App. 1974).  (*See* Philadelphia's response brief, Dkt. 41 at p. 3, noting its agreement with Pebble Point regarding the standards the court should apply).

In *Atlas,* the court affirmed a trial court's decision *not* to set aside an appraisal award of the amount of loss an insured suffered when his building was totally destroyed by fire.  The trial court required evidence of fraud, mistake, or misfeasance, or otherwise the appraisal award would be deemed binding on the parties.  *Id.* at 812.  The *Atlas* court ruled the trial court had properly framed the issues.  *Id.*  Quoting in part from a 1903 decision of the Indiana Supreme Court, the court stated:  "The Courts of Indiana will not hesitate to set aside an appraisal award if it is tainted with fraud, collusion or partiality for appraisers, though selected by the respective parties, 'must act free from bias, partiality, or prejudice in favor of either of the parties.'"  *Id.* at 813 (quoting *Insurance Co. of North America of Philadelphia v. Hegewald,* 66 N.E. 902, 905 (Ind. 1903)). It further found apt an admonition by the United States Court of Appeals for the Sixth Circuit (which cited

13

44 Am.Jur.2d Insurance § 1719 (1969)), that a court should "'indulge in every reasonable presumption'" to sustain an appraisal award "'in the absence of fraud, mistake, or misfeasance.'"  *Id.* (quoting *Lakewood Mfg. Co. v. Home Ins. Co.,* 422 F.2d 796, 798 (6th Cir. 1970)).  Because the *Atlas* insured's attack on the appraisal award was not grounded in allegations of "manifest unjust[ness]," a taint of "fraud, collusion, misfeasance, or the like," or "bias, prejudice or partiality," (*see id.* at 814), the appraisal award was binding on the parties.  *Id.* at 816.

The case law is consistent that Indiana law, as espoused in *Atlas,* requires evidence of "fraud," "collusion," "misfeasance," "bias," or some similar exceptional circumstance of "manifest injustice" to set aside an appraisal award.  *Huber v. United Farm Family Mut. Ins. Co.,* 856 N.E.2d 713 (Ind. Ct. App. 2006) (complaint alleging that insurer falsely represented the umpire was impartial, that umpire had past business relationships with the insurer and had known the insurer's appraiser for more than 15 years, and that umpire stated he could ignore information provided by the insured's appraiser stated a claim for setting aside an appraisal award under *Atlas* standards); *Jupiter Aluminum Corp. v. Home Ins. Co.,* 225 F.3d 868, 875 (7th Cir. 2000) ("Under Indiana law, an appraisal is binding unless it can be shown that the appraisal is infected with unfairness or injustice."); *FDL, Inc. v. Cincinnati Ins. Co.,* 135 F.3d 503, 505 (7th Cir. 1998) ("Exceptional circumstances [for setting aside an appraisal award] include manifest injustice, fraud, collusion, misfeasance or the like.")

14

Though the governing standard is easy enough to describe, the case law applying the standard to an evidentiary record is slim.  In *Atlas* itself, the complaining party had not even alleged any manifest unfairness or injustice in the appraisal process.  The same is true of *Lakewood,* a case cited by *Atlas* in its adoption of the governing standard, where the court found there were no contentions that fraud, manifest mistake, or misfeasance had occurred.  *Lakewood,* 422 F.2d at 799 (6th Cir. 1970).

*FDL, Inc.,* 135 F.3d at 505 (7th Cir. 1998), is the same—the insured's complaint about the award did not concern manifest injustice, fraud, collusion, misfeasance, or the like.  *Huber,* 856 N.E.2d 713 (Ind. Ct. App. 2006), confirms only that a complaint alleging fraud and bias in an appraisal process states a claim under the *Atlas* standard.  *Jupiter,* 225 F.3d 868, 875-76 (7th Cir. 2000), is similar in that the insured stated a claim for misfeasance in the appraisal process under *Atlas*, but at summary judgment, he presented no evidence to support his assertions of misfeasance and the award was thus binding against him.

The Indiana Supreme Court's decision in *Hegewald,* 66 N.E. 902 (Ind. 1903), from which *Atlas* gleaned, in part, a governing standard for setting aside an appraisal award under Indiana law, is based on factual findings by the trial court summarized in the opinion.  *See* 66 N.E. at 906 ("The facts as found by the court and set out in the special findings . . . substantially sustain [the allegations of] the complaint.")  The trial court focused on the relationship between the insurer and its appointed appraiser who, under the terms of the insurance contract, was required

15

to be disinterested.  The insurer had many private conversations with the appraiser, and it appeared his views were "under the directions and advice" of the insurer rather than a result of an independent, unbiased, and professional assessment.  *Id.* at 907.  The insurer's appraiser and the umpire also appeared to have "acted together in the interest of" the insurer, rather than in their required "quasi judicial capacity" requiring them to be "free from bias, partiality, or prejudice in favor of either of the parties."  *Id.* at 906.  In another case applying Indiana law, improper bias was evident from the payment arrangement between the insured and one of the three appraisers—he was paid, in part, on a contingency basis measured by the outcome of the appraisal; the higher the appraisal award, the better his compensation.  *Shree Hari Hotels, LLC v. Society Ins.,* 2013 WL 4777212 at *1-2 (S.D. Ind. Sept. 5, 2013).  The court, not surprisingly, found it axiomatic that "'an appraiser with a financial interest in the outcome of the appraisal is not impartial.'" *Id.* at *2 (internal quotation and citations omitted).

No particular fact pattern emerges as either necessarily sufficient or insufficient to warrant setting aside an appraisal award.  It is clear, however, that the court must be satisfied that an injustice of some seriousness occurred, whether because of fraud, collusion, partiality, or other misfeasance in the appraisal process. The court now turns to an examination of the facts in light of that standard.

## II.   <u>The Appraisal Award Must Be Set Aside</u>

In applying the standard, the court does not focus solely on any particular fact in isolation, but rather on the totality—or the cumulative import—of the facts.

Doing so here, the court is convinced that the appraisal award here must be set aside. Reasonable factfinders could conclude that the facts here establish partiality or bias; others might characterize it as misfeasance, others still as arbitrariness. But regardless of the specific label, the court finds inescapable the conclusion that the appraisal process was grossly flawed and tainted by inappropriate conduct manifestly unfair to Pebble Point.

In explaining why it believed an appraisal process would be a meaningless exercise in the first place, Philadelphia Insurance stressed to the court that the parties' differences of opinion about the amount of loss stemmed from differing views about causation —whether damages to any particular building's roof was caused by wind or hail (a covered cause) or by manufacturing or construction defects or normal wear and tear (non-covered causes). After the court ordered an appraisal process to be implemented and the parties then submitted panels of candidates for the court's selection of an umpire, Philadelphia Insurance urged the court to select an *engineer* as the proper umpire, and *not to choose* any of the persons proposed by Pebble Point because they were not engineers. It stated:

> Notably none of the umpires proposed by Defendant Pebble Point have an engineering background. As briefed in the prior Declaratory Judgment Complaint and the following Motion to Dismiss, the parties' disagreement on the value of the claim stems from causation issues. The real disagreement is not the dollar amount to replace and/or repair all of the roofing systems, but whether all of the roofs need actual repair and/or replacement stemming from a weather loss. An engineer is needed to assess these causation issues and what damages are related to the claimed cause.

Dkt. 31 at pp. 1-2 (emphasis in original).

Despite the importance of engineering expertise, Mr. Balistreri (the umpire) refused to allow Pebble Point to submit engineering expertise on its behalf.  He "rejected [the] admission" of the engineering report prepared by Mr. Badiu (*see* Lamont Aff., ¶ 9) and forbad Mr. Badiu from providing any testimony at the site inspection.  Mr. Balistreri did so even though Mr. Badiu's report was provided, and the fact he would provide testimony at the inspection was disclosed, in accordance with rules Mr. Balistreri himself had imposed.

Recall that Mr. Badiu's engineering report had been sent to Mr. Balistreri on April 22, 2015. (Lamont Aff., ¶ 4). In his May 19, 2015 email (about 10 days before the May 28 site inspection date), Mr. Balistreri acknowledged he had received Mr. Badiu's engineering report—which is dated April 15, 2015—and inquired of Mr. Lamont and Mr. Zwolfer about the fund of materials that would be submitted for consideration, and warned he would not accept "last minute submissions at the site."  (*Id.,* ¶ 5).  After Mr. Lamont confirmed Mr. Balistreri's assumption that Mr. Badiu would provide testimony regarding his engineering report, Mr. Balistreri directed Mr. Lamont to distribute "any reports [Mr. Badiu] may have written to the entire appraisal panel before end of day" that same day, on May 26, 2015.  (*Id.,* ¶ 7). Even though Mr. Lamont indisputably complied with this instruction, Mr. Balistreri announced that he was "rejecting its admission" because he "asked for all this stuff a long time ago and . . . there is little time at this late hour" to "download, print, review, and make sense" of it.  (*Id.,* ¶ 9).

The facts do not permit a conclusion the report was supplied at a "late hour" to Mr. Balistreri.  The report had been given to Mr. Balistreri more than one month before, on April 22, 2015.  Moreover, Mr. Lamont had followed Mr. Balistreri's instructions by circulating the same report on May 26.

It was Mr. Zwolfer (not Mr. Balistreri) who first received the engineering report with the Drop Box link sent by Mr. Lamont's May 26 email.  (Zwolfer Aff., ¶ 2, "[Mr. Badiu's engineering] report was not supplied to me until May 26, 2015, or two (2) days before the [May 28 inspection] meeting.")

Though it is not known when or by what method of communication Mr. Zwolfer told Mr. Balistreri he had not received the engineering report until the Drop Box link on May 26, it would be reasonable to conclude such a communication occurred.  That may explain why Mr. Balistreri, in his early May 26 email, emphasized his instruction for Mr. Lamont to distribute any reports before the end of the day "to the entire appraisal panel" and "be certain  Steve [Zwolfer] and I have a complete copy to review prior to our site visit." (Lamont Aff., ¶ 7).  The lack of information before the court about how Mr. Balistreri knew Mr. Zwolfer did not have the Badiu report until the Drop Box link (Mr. Zwolfer had known about a Pebble Point engineering report since at least May 19)[4] calls into serious question Mr. Zwolfer's affidavit testimony denying the occurrence of any *ex parte*

---

[4]     Mr. Balistreri referred to an engineer report supplied by Mr. Lamont in the May 19 email he sent to both Mr. Zwolfer and Mr. Lamont.  (Lamont Aff., ¶ 5).

communications between him and Mr. Balistreri other than several scheduling emails between May 23 and 25, 2015.  (*See* Zwolfer Aff., ¶¶ 8-9).

Mr. Balistreri's reason, given in his second May 26 email, for rejecting the admission of Mr. Badiu's report—that it was too much to review and make sense of two days before the site inspection—also suggests an undisclosed communication between Mr. Zwolfer and Mr. Balistreri or some other bias in favor of Mr. Zwolfer or the insurer.  Because Mr. Balistreri had already had the report for more than one month, it was only conceivably Mr. Zwolfer who had "little time at this late hour" to "review and make sense of" the report before the site visit.  Either Mr. Zwolfer had complained to Mr. Balistreri, on an *ex parte* basis, his view the report had been supplied too late to review and make sense of it, or Mr. Balistreri took it upon himself to decide—without any input from Mr. Zwolfer (or Mr. Lamont)—that Philadelphia Insurance was prejudiced by the transmittal of Mr. Badiu's report on May 26.  If there was an *ex parte* conversation between Mr. Zwolfer and Mr. Balistreri on this topic, then Mr. Zwolfer's affidavit testimony denying any such conversations is inaccurate or false.  And even if that conversation did not occur, Mr. Balistreri's unsolicited rejection of the report because of some perceived prejudice to Mr. Zwolfer (and Philadelphia Insurance) would indicate improper bias in favor of Philadelphia Insurance.  In other words, if Mr. Zwolfer's denial of *ex parte* communications with Mr. Balistreri about Pebble Point's engineering report is believed, then Mr. Balistreri—without knowledge Mr. Zwolfer had only just received it and without knowledge that Mr. Zwolfer or the insurer found it unfair or

prejudicial—unilaterally rejected it even though it had been submitted in compliance with Mr. Balistreri's instructions.  That in itself would indicate bias or partiality.

Philadelphia Insurance (or Mr. Balistreri) has attempted to avoid the inferences arising from these circumstances by claiming that, despite his announcement he was rejecting it, Mr. Balistreri did in fact consider the Badiu report.  In the court's view, this effort merely digs the hole deeper.  After the Appraisal Award was made and Mr. Lamont asked for an explanation why Mr. Balistreri had not allowed Mr. Badiu's report and Mr. Badiu's testimony, Mr. Balistreri claimed in an email that he did "consider the report."  (Dkt. 41-4 at p. 1). He said:  "You did not provide ample notification for the other side to have their own expert present even though I asked for notification ten days prior to our inspection.  I did, however, consider his report."  (*Id.*)[5]

The statement itself, and its surrounding circumstances, call its veracity into question and, in fact, further evidences improper bias in favor of Philadelphia

_____

[5]      The "ten days prior" language does not appear in any communication from Mr. Balistreri to the parties' appraisers as an express instruction.  It certainly cannot be read as a directive that the reports had to be distributed ten days in advance of the inspection; this language appeared only after the fact and, in any event, would be inconsistent with Mr. Balistreri's instruction on May 26 to circulate any reports that day.  The confusion apparently arises from Mr. Balistreri's misplacement of the modifier.  The court assumes he meant that ten days before the inspection (via his May 19 email), he asked the appraisers to notify him before the inspection of any intended expert testimony to be given at the inspection.  And if, notwithstanding this explanation, Mr. Balistreri *did* mean that he rejected Mr. Badiu's testimony because he was not disclosed at least ten days before the inspection, then that would be further demonstration of partiality, misfeasance, or arbitrariness—for the reasons explained earlier in this footnote.

Insurance.  First, Mr. Balistreri's email explanation was made on June 15, 2015, a week after he had signed and delivered the appraisal award.  At no time before the award did Mr. Balistreri notify the parties that despite his unequivocal prior rejection of Mr. Badiu's report, he had decided he would consider it in reaching his decision.  Second, whatever the extent of Mr. Balistreri's consideration of the report, he refused to permit Mr. Badiu to offer testimony at the site, and he did so on the indefensible ground Mr. Badiu's report and the disclosure he would testify had been supplied too late.  As already addressed, Mr. Badiu's report and the fact he intended to testify at the site were not late at all, but were matters disclosed on the very time-table Mr. Balistreri had himself set in his May 19 and first May 26 emails. The after-the-fact explanation that the report and testimony were appropriately disallowed because they were made too late is unfounded, makes dubious his claim that he did "consider" the report, and reflects improper bias in favor of Philadelphia Insurance or an otherwise grossly flawed process.

As for Mr. Balistreri's statement that "[Mr. Lamont] did not provide ample notification for the other side to have their own expert present," there is no suggestion in any document Philadelphia Insurance even wanted an opportunity to have an expert engineer at the site.  There is no evidence Mr. Zwolfer ever disclosed such an expert, despite Mr. Balistreri's email on May 19 to both Mr. Zwolfer and Mr. Lamont that acknowledged his receipt of an engineer report from Mr. Lamont, and required both sides to disclose experts who were expected to testify at the site visit.  It would have been odd for Mr. Balistreri to have surmised Philadelphia

Insurance wanted its "own expert present" unless that sentiment had been expressed to him by Mr. Zwolfer in an undisclosed *ex parte* conversation.

All of these circumstances place in a negative light the existence of the prior business relationship between Mr. Balistreri and Mr. Zwolfer and their failure timely to disclose it.  The court lacks detail about their prior relationship, an omission that raises the court's concern over the completeness and candidness of Mr. Zwolfer's affidavit.  The revelation of their prior business relationship at the site inspection (assuming it was made and they didn't just shrug their shoulders as Mr. Lamont has claimed), and only after inquiry by Mr. Lamont, points to bias, particularly when considered in the context of all the other problems with this process.

That relationship could have, and should have, been disclosed much earlier and in sufficient detail to permit Pebble Point to evaluate whether to object to Mr. Balistreri's service as umpire.  It should have also been disclosed to the court, which was endeavoring to select a neutral umpire.  Whether Philadelphia Insurance knew of the prior relationship when it nominated Mr. Balistreri as a candidate for selection as a neutral umpire by the court, Mr. Zwolfer could have disclosed the relationship to Philadelphia Insurance—who should have then disclosed it to Pebble Point and the court—when he first learned Mr. Balistreri was selected.  The court acknowledges that perhaps a finite group of individuals may be available to perform the umpire role in connection with particular types of losses, and that repeat business and prior relationships may be routine or not uncommon.  But the failure

to disclose it—when viewed along with all the other deeply questionable circumstances discussed in this opinion—removes it from the routine.  For all of these reasons, the court finds the Appraisal Award should be set aside as tainted by improper misfeasance, partiality, or arbitrariness in the appraisal process.

## IV.   __The Proper Remedy__

Having determined that the appraisal award should be set aside, the court must ask, "What's next?"  Should the parties be sent back for a second appraisal proceeding or should the matter of Pebble Point's losses due to covered causes be determined in this litigation? At the October 1, 2015 hearing, the court asked the parties for their positions on this issue.  Pebble Point, which originally advocated the appraisal process, stated that coverage and loss issues should now be litigated, and Philadelphia Insurance, which originally resisted the appraisal process, stated that the court should order a second appraisal proceeding if it granted Pebble Point's motion and set aside the appraisal award.  Neither party has provided any authority for its position.

The court, based on its own research and its consideration of the core nature of the parties' dispute and the relevant Policy language, determines that a second appraisal proceeding is not the appropriate course.  Rather, Pebble Point's claims now should be litigated, including all causation and valuation issues.  The court found several cases where, on finding the appraisal award should be set aside, the courts did not require a "do-over" appraisal but allowed the insured/insurer to litigate the insured's covered losses without regard to the tainted appraisal award.

The courts did not provide an analysis leading to that result, perhaps because the issue was not debated by the parties and because it seems a reasonable result.  *See Hegewald,* 66 N.E. 902 (Ind. 1903) (affirming trial court's judgment deciding plaintiff/insured's fire losses without regard to appraisal award the trial court found was invalid because of misfeasance in the appraisal process); *St. Paul Fire & Marine Ins. Co. v. Tire Clearing House,* 58 F.2d 610, 612, 616 (8th Cir. 1932) (affirming trial court's decision to set aside appraisal award, declare it a "nullity," and proceed to trial without re-appraisal); *Shree Hari Hotels, LLC v. Society Ins.,* 2013 WL 4777212 at *3 (S.D. Ind. Sept. 5, 2013) ("[T]he Appraisal Award is set aside and is not admissible at trial because it was the product of an improper appraisal process.")

The wide disparities in evaluations of Pebble Point's losses—over half a million dollars according to Pebble Point's selected appraiser and only about $16,000 according to Philadelphia Insurance's selected appraiser—are not based on wide differences of opinion as to the value of roof damages, or even interior damages, but are attributable to the parties' wide differences of opinions about the extent to which roof damages (or interior damages) were *caused* by a covered event (like a storm) or by a non-covered event (like wear and tear or construction defect). Philadelphia Insurance has acknowledged this from the outset.  Moreover, the court earlier agreed with Philadelphia Insurance—based on the provision in the Policy that Philadelphia Insurance retains its "right to deny the claim" even if there is an appraisal—that despite an appraisal award, Philadelphia Insurance presumably

could still "interpos[e] defenses from elsewhere in the contract, such as 'uncovered' causes of loss."  (Dkt. 29 at p. 13).  If, in fact, Philadelphia Insurance could insist on litigating causation issues if it were dissatisfied with a new appraisal award, that is another reason the court should not force another appraisal proceeding but rather simply proceed to litigating the causation and damages issues.

Because an appraisal proceeding was had, that condition precedent to litigation has been satisfied.  Though the award from that appraisal should be set aside because of the tainted appraisal process, there is no persuasive reason—and Philadelphia Insurance has not cited one—for requiring the parties to re-engage in another appraisal process.  The Magistrate Judge therefore recommends that the court order that the parties' insurance dispute—causation and damages—may now be litigated in this court.

## Conclusion

For the foregoing reasons, the Magistrate Judge recommends that the District Judge GRANT Pebble Point's motion (Dkt. 39), set aside the appraisal award, and order that the parties' insurance dispute may now be adjudicated in this court.

Any objections to this Report and Recommendation must be filed in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b).  The failure to file objections within 14 days after service will constitute a waiver of subsequent review absent a showing of good cause for that failure.  The parties should not anticipate any extension of this deadline or any other related briefing deadlines.

IT IS SO RECOMMENDED.

Dated:  January 28, 2016

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record by email through the court's ECF system